United States District Court
Southern District of Texas
**ENTERED**
May 01, 2018
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| MARTIN ARMSTRONG, | § |
| | § |
| Plaintiff, | § |
| | § |
| | § |
| VS. | § CIVIL ACTION NO. 3:16–CV–00115 |
| | § |
| MARATHON PETROLEUM | § |
| COMPANY, LP, | § |
| | § |
| Defendant. | § |

## MEMORANDUM AND RECOMMENDATION

Plaintiff Martin Armstrong ("Armstrong") brings this employment discrimination case alleging race discrimination arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"), averring disability discrimination under the American with Disabilities Act, 42 U.S.C. § 12112 ("ADA"), and claiming that Marathon Petroleum Company LP ("Marathon") retaliated against him due to his disability.  Marathon has moved for summary judgment.  (Dkt. 25).

All dispositive pretrial motions in this case were referred to this Court for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  (Dkt. 57).  Having considered the parties' briefing, the applicable legal authorities, and the summary judgment record, the Court RECOMMENDS that Marathon's Motion for Summary Judgment (Dkt. 25) be GRANTED and Marathon's Objections to Plaintiff's Evidence

Opposing Summary Judgment (Dkt. 43) be DENIED.  The reasons are explained in detail below.

## I. BACKGROUND

Armstrong has a long history working for numerous companies in the oil and gas and construction businesses.  As it relates to the present case, Armstrong began working for British Petroleum at its Galveston Bay Refinery in 2004.  Unfortunately, a terrible explosion rocked the Galveston Bay Refinery in 2005, killing several of Armstrong's fellow employees.  As a result of this devastating incident, Armstrong suffers from Post Traumatic Stress Disorder ("PTSD").

Marathon acquired the Galveston Bay Refinery at the beginning of 2013 and Armstrong continued to work at the refinery as a Marathon employee.  He started at Marathon as a Senior Project Control Specialist.  In this role, Armstrong's primary duties included approving schedules, reviewing estimates, and developing project execution plans.  Marathon contends that absenteeism emerged as a significant problem during the first four months of Armstrong's employment with Marathon.

At the end of May 2013, Marathon placed Armstrong on a temporary assignment, a project known as the Frontier Project.  This two-year assignment required Armstrong to regularly travel from Houston, Texas to Marathon's headquarters in Findlay, Ohio.  According to Marathon, Armstrong's absentee problems continued in this new role, with Armstrong frequently missing work and failing to contact his supervisors to provide his whereabouts.  Armstrong acknowledges that he missed flights to Ohio on several

occasions and had trouble with his new work schedule. He attributes these attendance issues to the effects of PTSD.

At the end of September 2013, only four months into this new assignment, Marathon removed Armstrong from the Frontier Project, and he returned to work at the Galveston Bay Refinery as a Time and Attendance/Hiring Plan Coordinator ("Plan Coordinator"). In this position, Armstrong helped develop a hiring plan for a scheduled maintenance turnaround—that is, an event where the entire refinery is shut down for an extended period of time to perform maintenance on major equipment. When Armstrong initially assumed the position as Plan Coordinator, he worked a "9/80" schedule—working 80 hours over nine days, averaging roughly nine hours a day. Marathon told Armstrong that once the turnaround started he would be expected to work seven days a week for 10+ hours a day for the duration of the turnaround ("Turnaround Schedule"), which could last two to three months. The turnaround was scheduled for the early part of 2014.

In December 2013, with the turnaround date fast approaching, Armstrong informed his supervisors that due to his disability (PTSD) he would be unable to work the Turnaround Schedule. That same month, Armstrong also met with Angela Chen ("Chen"), a Marathon Human Relations Consultant, and informed her that he could not work such long hours due to his disability. Chen informed Armstrong that the Plan Coordinator position required extended hours to support the turnaround and that everyone from the maintenance department involved in the turnaround also had to work such hours.

3

After Armstrong informed Marathon that he would be unable to work the Turnaround Schedule due to his pre-existing medical condition, Marathon moved Armstrong to a new position: Outside Shop Coordinator.  In this new role, Armstrong worked four days a week during the turnaround—monitoring the repair, cleaning, and inspection of refinery equipment.  Once the turnaround ended, Marathon moved Armstrong to a role as a Master Job Card Planner, where he worked his preferred "9/80" schedule.

In March 2014, Marathon provided Armstrong his 2013 performance evaluation. It was not good.  On a scale from a high of one ("Far exceeds performance expectations") to a low of five ("Fails to meet performance expectations"), Armstrong received the worst possible grade, a five.  Armstrong contends that the performance evaluation was unfair and that he excelled at his job.

Because of the poor performance evaluation, Marathon placed Armstrong on a Performance Improvement Plan ("PIP") to convey Marathon's expectations and assist Armstrong in improving his overall performance.  The PIP began on March 24, 2014, and was scheduled to run for 90 days.  During the PIP, Armstrong met frequently with various supervisors to track his progress.  Armstrong understood that he could be terminated if his performance failed to meet expectations by the end of the 90-day period.

On June 24, 2014, one day prior to the expiration of his 90-day PIP, Armstrong applied for leave under the Family and Medical Leave Act ("FMLA").  He eventually took long-term disability and returned to Marathon from medical leave on May 2, 2016, at which point he was still subject to the terms of the PIP.  Marathon terminated

Armstrong the same day he returned to work, contending that Armstrong had failed to improve his performance during the PIP.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the claim it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (internal quotation marks and citation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56 burden, the nonmovant must identify "significant probative evidence that there exists a genuine issue of material fact." *Atkins v. Szymczak*, 710 F. App'x 223, 224 (5th Cir. 2018) (internal quotation marks and citation omitted). "This burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (internal quotation marks and citation omitted). "In deciding whether a fact issue

exists, courts must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party." *Rayborn v. Bossier Par. Sch. Bd.*, 881 F.3d 409, 414 (5th Cir. 2018) (quotation marks and citation omitted).

## III. EVIDENTIARY OBJECTIONS

Before considering the merits of Marathon's Motion for Summary Judgment, this Court must address Marathon's objections to Armstrong's evidence opposing summary judgment. (Dkt. 43).

Marathon objects to the following exhibits on the basis of relevance: Armstrong's resume; Armstrong's list of speaking engagements; documents related to Armstrong's leave under the FMLA; and documents related to Armstrong's Equal Employment Opportunity Commission ("EEOC") claim. Relevant evidence has a "tendency to make a fact more or less probable than it would be without the evidence" and relates to a fact "of consequence in determining the action." FED. R. EVID. 401. The test for relevance established by Rule 401 is a "liberal one" and the documents at issue here meet that lenient standard. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587 (1993). As such, Marathon's objections on the basis of relevance are OVERRULED.

Next, Marathon claims that select portions of Armstrong's affidavit should be excluded because they contradict Armstrong's sworn deposition testimony. Putting aside whether or not there is a real conflict in the affidavit and the deposition testimony, this Court is reluctant to exclude such testimony at the summary judgment stage. *See Rekieta v. K-Mart Corp.*, No. 3:96-CV-1142-R, 1998 WL 7143, at *4 (N.D. Tex. Jan. 5, 1998) (holding that non-movant's later-filed affidavit, which contradicted affiant's previous

deposition testimony, created a question of the witness's credibility appropriate for resolution by jury). As a result, Marathon's objection to Armstrong's affidavit is OVERRULED.

Marathon also objects to Armstrong's inclusion in the summary judgment evidence of Marathon's Position Statement before the EEOC, blithely asserting that the Position Statement is hearsay. Marathon's objection to the Position Statement is OVERRULED since admissions by a party-opponent are exceptions to the hearsay rule. *See* FED. R. EVID. 801(d)(2)(A); *Magiera v. City of Dallas*, 389 F. App'x 433, 439 (5th Cir. 2010) (finding that a statement is admissible under the party-opponent exception when the employee is speaking in the course of his employment).

Finally, Marathon objects on the basis of inadmissible hearsay to those documents related to the diagnosis of Armstrong's PTSD. Armstrong contends that these documents are admissible under Fed. R. Evid. 803(4), which establishes a hearsay exception for statements made for medical diagnosis or treatment. It is, admittedly, not clear that these documents contain statements made for medical diagnosis or treatment. Nonetheless, because all reasonable inferences must be drawn in favor of the non-moving party at the summary judgment stage, this Court will consider such documents. This result is especially appropriate here since the documents could easily be put in admissible form as medical records under Fed. R. Evid. 803(6), which establishes a hearsay exception for business records. *See Tullous v. Tex. Aquaculture Processing Co. LLC*, 579 F. Supp. 2d 811, 817 (S.D. Tex. 2008) ("In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should be more lenient in allowing evidence that

is admissible, though it may not be in admissible form.") (citation omitted).  As such, Marathon's evidentiary objections are OVERRULED.

## IV. DISCUSSION

### A.   RACE AND COLOR DISCRIMINATION

Armstrong first claims that Marathon intentionally engaged in unlawful employment practices against him because of his race and color in violation of Title VII and Section 1981.

### 1.   Applicable Law

Title VII prohibits an employer from discriminating based on "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  Racial discrimination claims under Section 1981 are analyzed under the same evidentiary framework as employment discrimination claims under Title VII.  *See Finley v. Florida Par. Juvenile Det. Ctr.*, 574 F. App'x 402, 404 (5th Cir. 2014) ("Claims of racial discrimination brought under § 1981 are governed by the same evidentiary framework applicable to claims of employment discrimination brought under Title VII.") (quotation marks and citation omitted).  A plaintiff "may prove a claim of intentional discrimination or retaliation either by direct or circumstantial evidence." *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).  If no direct evidence exists, Title VII claims proceed under the *McDonnell Douglas* framework to determine whether summary judgment is appropriate. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

To survive summary judgment under *McDonnell Douglas*, the plaintiff carries the initial burden of establishing a prima facie case of racial discrimination.  *See Davis v.*

*Dallas Area Rapid Transit*, 383 F.3d 309, 316 (5th Cir. 2004) ("To survive summary judgment under McDonnell Douglas, the plaintiff must first present evidence of a prima facie case of discrimination.") (citation omitted). This "requires a showing that the plaintiff (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group." *McCoy*, 492 F.3d at 556 (citation omitted). "If the plaintiff presents a prima facie case, discrimination is presumed, and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the underlying employment action." *Davis*, 383 F.3d at 317. If the employer meets its burden of production, the burden shifts back to the plaintiff to prove "the employer's proffered reason is not true but instead is a pretext for the real discriminatory ... purpose." *McCoy*, 492 F.3d at 557.

### 2.    Discussion

Marathon contends that Armstrong cannot establish a prima facie case of racial discrimination because (1) he does not present evidence of an adverse action (the third prong); and (2) he cannot show that any similarly situated employees, outside the protected class, were treated more favorably (the fourth prong). In response, Armstrong states that he is abandoning his racial discrimination and race retaliation claims brought under Title VII and Section 1981. Because Armstrong has expressly abandoned his Title VII and Sections 1981 claims and, as a result, failed to carry his summary judgment

burden on these claims, the Court recommends that summary judgment be entered in favor of Marathon on the Title VII and Section 1981 claims.

## B.    ADA FAILURE TO ACCOMMODATE CLAIM

Next, Armstrong claims that Marathon discriminated against him in violation of the ADA by failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ...." 42 U.S.C. § 12112(b)(5)(A).    This type of claim is commonly referred to as a "failure to accommodate" claim.[1]    Armstrong's specific complaint is that Marathon failed to accommodate him when his PTSD prevented him from working the long hours required during the turnaround period as the Plan Coordinator.

### 1.    Applicable Law

"[T]he ADA does not relieve a disabled employee or applicant from the obligation to perform the essential functions of the job.  To the contrary, the ADA is intended to enable disabled persons to compete in the work-place based on the same performance standards and requirements that employers expect of persons who are not disabled." *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 808 (5th Cir. 1997) (citation omitted).

A prima facie case for a failure to accommodate claim requires a plaintiff to show that: "(1) the plaintiff is a 'qualified individual with a disability;' (2) the disability and its consequential limitations were 'known' by the covered employer; and (3) the employer

---

[1] Plaintiff's First Amended Original Complaint and Jury Demand asserts a cause of action for violations of the ADA, alleging that Marathon "intentionally engaged in unlawful employment practices involving [Armstrong] because of his disability."  (Dkt. 5 at 6).  At oral argument on Armstrong's Motion for Summary Judgment, Armstrong's counsel made clear that the only ADA disability claim raised in this lawsuit is a failure to accommodate claim.

failed to make 'reasonable accommodations' for such known limitations." *Credeur v. La. Through Office of Atty. Gen.*, 860 F.3d 785, 792 (5th Cir. 2017) (quoting *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 247 (5th Cir. 2013)).

"The ADA does not require an employer to accommodate an employee who is not qualified for the job." *Wolf v. Lowe's Cos., Inc.*, No. 4:16-CV-01560, 2018 WL 1322243 (S.D. Tex. Mar. 13, 2018) (citing *Hypes v. First Commerce Corp.*, 134 F.3d 712, 716 (5th Cir. 1998)). Importantly, "[a]n ADA plaintiff bears the burden of proving that [he] is a 'qualified individual with a disability ....'"[2] *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). *See also Moss v. Harris Cty. Constable Precinct One*, 851 F.3d 413, 419 (5th Cir. 2017) ("It is the plaintiff's burden to show that he is qualified under the ADA.").

A qualified individual is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds." 42 U.S.C. § 12111(8). Whether a function is "essential" must be determined on a case–by–case basis. *E.E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 698 (5th Cir. 2014) ("Fact-finders must determine whether a function is essential on a case-by-case basis.") (internal quotation marks and citation omitted) In general, "[a] function is essential if it bears more than a marginal relationship to an employee's job." *Cannon v. Jacobs Field Services North America, Inc.*, 813 F.3d 586, 592 (5th Cir. 2016) (internal

---

[2] Under the ADA, an individual suffers from a "disability" if that individual has a "physical...impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1). There is no dispute here that Armstrong's PTSD qualifies as a "disability." The central issue is whether Armstrong is a "qualified individual."

quotation marks and citation omitted).  *See also* 29 C.F.R. §1630.2(n)(1) (defining essential functions as those that are "fundamental" as opposed those that are "marginal"). The ADA specifically provides that the employer's own judgment regarding which functions are essential is to be given great weight. 42 U.S.C. § 12111(8).

Not surprisingly, "there is general consensus among courts … that regular work-site attendance is an essential function of most jobs." *Credeur*, 860 F.3d at 793 (collecting cases). Common sense tells us that "an employee who does not come to work cannot perform any of his job functions, essential or otherwise." *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994) (internal quotation marks and citation omitted).  "This is especially true when the position is interactive and involves a significant degree of teamwork." *Credeur*, 860 F.3d at 793.

## 2.    Discussion

Marathon contends that Armstrong has failed to establish any of the three required elements of his prima facie failure to accommodate case.  More specifically, Marathon argues that Armstrong has not established that (1) he is a "qualified" individual within the meaning of the ADA; (2) he informed Marathon of his disability; or (3) Marathon failed to provide a reasonable accommodation.

This Court will first address whether Armstrong is a "qualified" individual under the meaning of the ADA.  *See Creduer*, 860 F.3d at 795 (an employee pursuing a failure to accommodate claim "must first demonstrate that [he] is a 'qualified' individual, *i.e.*, that [he] can perform the essential functions of [his] job unaided or with the assistance of a reasonable accommodation").  If Armstrong is not a "qualified" individual, his failure

to accommodate claim fails. If Armstrong is a "qualified" individual, this Court must determine whether Armstrong has shown that Marathon knew of his disability and, nonetheless, failed to make reasonable accommodations.

Marathon's position is that working long hours for months during the turnaround period is essential to the Plan Coordinator job. *See* (Dkt 25-10 at 2) (Armstrong "was told that he needed to be able to support the Turnaround, which meant that he had to work Monday through Sunday, at least 10 hours a day for the duration, which was about 2-3 months"); (*Id.*) ("the role [Armstrong] was currently in [Plan Coordinator] required the extended hours"); (*Id.* at 3) (The Plan Coordinator needs "to be relied upon to produce a report Monday through Sunday during the Turnaround. It was critical for the report to come out daily in a timely manner."). Marathon's stance is unremarkable. To successfully perform his job duties as Plan Coordinator, Armstrong had "to communicate with multiple team members and contractors to coordinate efforts" and, therefore, needed to work long hours for the entire duration of the turnaround. (Dkt. 25-12). It should surprise absolutely no one that regular and predictable on-site attendance is an essential function of the job. Importantly, Marathon did not single out Armstrong to work long hours during the turnaround. Quite the opposite, Armstrong readily admits that Marathon's Human Resources Consultant, Chen, told him: "Everyone in the Maintenance Department has to work these hours and you have to as well." (Dkt. 42-4 at 3).

It is telling that Armstrong does not challenge the notion that a Plan Coordinator must work the Turnaround Schedule. Armstrong presents no evidence—none—that remotely suggests that the highly interactive job of a Plan Coordinator can be effectively

performed during the turnaround on anything other than the Turnaround Schedule. Instead, Armstrong simply claims that he informed Marathon of his disability and Marathon did not afford him the opportunity to modify his work schedule so that he could work fewer hours and fewer days.   But that argument puts the proverbial cart before the horse.   This Court must first determine whether working long hours is an essential function of the Plan Coordinator position.   If working long work hours is an essential function of the Plan Coordinator job and Armstrong cannot fulfill that requirement, then he is not "qualified" for the position and Marathon is not required under the ADA to make any accommodations for him.

Based on the summary judgment evidence presented, this Court believes that an essential function of Armstrong's job as Plan Coordinator is to work the Turnaround Schedule.   As such, Armstrong is not "qualified" under the ADA because he is unable to "perform the essential functions" of the Plan Coordinator job "with or without reasonable accommodation."   42 U.S.C. 12111(8).   Because Armstrong has not demonstrated that he was qualified for the Plan Coordinator position, he cannot prove a prima facie claim for failure to accommodate.   As such, this Court recommends that summary judgment be entered in favor of Marathon on Armstrong's ADA failure to accommodate claim.

## C.    ADA RETALIATION

Armstrong's final cause of action is for retaliation.   Armstrong alleges in the First Amended Original Complaint that:

> [Marathon] instituted a campaign of retaliation that included moving him to a more arduous schedule.   Mr. Armstrong informed Ms. Chen, in Human Resources, of his disability, who claimed, she didn't want to hear it and still

14

had him work a schedule not conducive to his disability.  This retaliation was and is due to Plaintiff exercising his rights.  Plaintiff suffered damages for which Plaintiff herein sues….

Furthermore upon the same date of his return from disability leave on May 2, 2016, he was terminated even though he was released by his doctors as able to work.

(Dkt. 5 at 7).

### 1.    Applicable Law

The ADA prohibits employers from discriminating against employees because of a disability.  42 U.S.C. § 12112(a).  As a complement to its antidiscrimination mandate, the ADA broadly prohibits employer retaliation:  "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).

### (a) Prima Facie Case

In the absence of direct evidence, claims of retaliation under the ADA are analyzed under the *McDonnell Douglas* framework.  *See Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998) ("the district court did not err by holding that McDonnell Douglas provides the appropriate burden-shifting analysis for claims of unlawful retaliation under the ADA") (citations omitted).  To establish a prima facie case of retaliation under the ADA, a plaintiff must show that (1) he participated in an activity protected by the ADA; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse action.

*See Feist v. La., Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013).

An adverse employment action is any action "that a reasonable employee would have found ... [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks and citation omitted).   What constitutes an adverse employment action for purposes of a retaliation claim "must be viewed in context."   *McCoy*, 492 F.3d at 560 (citation omitted).   *See also Monsivais v. Arbitron, Inc.*, 44 F. Supp. 3d 702, 707 (S.D. Tex. 2014) (what constitutes an adverse employment action for a retaliation claim is "an objective fact-specific review 'because the significance of any given act of retaliation will often depend upon the particular circumstances.   Context matters.'") (quoting *Burlington N.*, 548 U.S. at 69)).

Once a plaintiff establishes that he participated in protected activity and an adverse employment action was taken against him, he must still show a causal connection between the two.   "In order to establish the causal link between the protected conduct and the illegal employment action ... the evidence must show that the employer's decision to terminate was based in part on knowledge of the employee's protected activity." *Sherrod*, 132 F.3d at 1122.   A plaintiff may satisfy the causal connection element by showing "very close" temporal proximity between the employee's protected activity and the adverse action.   *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001).   *See also Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) ("Close timing

between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a *prima facie* case of retaliation.") (citation omitted).

### (b) Legitimate Non-Retaliatory Reason

Under the *McDonnell Douglas* framework, if the employee establishes a prima facie case, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision. *Feist*, 730 F.3d at 454. The burden at this stage is relatively light and is satisfied if the defendant articulates any legitimate reason for the adverse action. *Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 900–901 (5th Cir. 2012).

### (c) Pretext

If the defendant advances a legitimate, non-retaliatory reason, the burden shifts back to the plaintiff to "adduce sufficient evidence that the proffered reason is a pretext for retaliation. Ultimately, the employee must show that 'but for' the protected activity, the adverse employment action would not have occurred." *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999). This portion of the analysis appears similar to the "causal link" step of the prima facie case, but the burden here is more stringent. *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 685 (5th Cir. 2001).

At the summary judgment stage, a plaintiff must establish pretext "through evidence demonstrating that discrimination lay at the heart of the employer's decision." *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). "Our anti-discrimination laws do not require an employer to make proper decisions, only non-retaliatory ones."

*LeMaire v. La. Dept. of Transp. and Dev.*, 480 F.3d 383, 391 (5th Cir. 2007) (citing *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991) (stating that "even an incorrect belief that an employee's performance is inadequate" is a legitimate reason)). "In order to avoid summary judgment, the plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity." *Feist*, 730 F.3d at 454 (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 308 (5th Cir. 1996)).

### 2.    Discussion

#### (a)    Prima Facie Case

Marathon argues that Armstrong has failed to establish a prima facie case of retaliation because there is no causal connection between Armstrong's protected activity and an adverse employment action against him. To assess the merits of this argument, this Court must first determine what events constitute (1) the protected activity; and (2) the adverse employment action against Armstrong. Once it is clear what events represent the protected activity and adverse employment action, this Court can evaluate whether Armstrong can establish a causal connection between the two events.

**The protected activity:** The parties agree that Armstrong's request for accommodation in December 2013 is considered a protected activity under the ADA. *See, e.g., Gagnon v. Hyatt Corp.*, A-11-CV-920-LY, 2013 WL 12292179, at *10 (W.D. Tex. Feb. 1, 2013) (a request for accommodation qualifies as a "protected activity").

Armstrong also argues that his EEOC charge of discrimination constitutes protected activity. As a legal matter, he is absolutely correct. *See Sherrod*, 132 F.3d at

1122 ("[Plaintiff] engaged in protected activity by filing EEOC complaints against [Defendant] based on the reasonable belief that [Defendant's] actions violated the ADA and ADEA."). Armstrong filed his formal EEOC charge on July 7, 2014, and that is the date one would expect to be characterized as the protected activity date. Armstrong, however, suggests that the date the EEOC sent its right-to-sue letter (February 5, 2016) should actually be considered the date of the protected activity. This argument is creative, but the United States Supreme Court has forcefully rejected Armstrong's position, characterizing it as an "utterly implausible suggestion that the EEOC's issuance if a right-to-sue letter—an action in which the employee takes no part—is a protected activity of the employee." *Clark Cnty. Sch. Dist.*, 532 U.S. at 273. Accordingly, to the extent the filing of the EEOC charge represents protected activity, the date of such protected activity should be considered July 7, 2014.

**The adverse employment action:**   There is no question that Armstrong's termination, which took place on May 2, 2016, is an adverse employment action. Marathon argues that Armstrong's termination is the *only* adverse employment action present in this case. By contrast, Armstrong argues that his placement on a PIP constitutes a separate adverse employment action. Thus, the question this Court must squarely address is whether placing an employee on a PIP is an adverse employment action that can support a retaliation claim.

Marathon contends that "courts in the Fifth Circuit do not regard the action of placing an employee on a PIP as an adverse employment action." (Dkt. 44 at 15). This is an inaccurate statement of the law. Recently, Judge George C. Hanks, Jr. addressed

19

whether a PIP can be a materially adverse action on which a plaintiff may base his retaliation claim:

> In the retaliation context, the Fifth Circuit has stated that a performance improvement plan ("PIP") might be the kind of "materially adverse action" on which a plaintiff may base his retaliation claim. *Ray v. Tandem Computs., Inc.*, 63 F.3d 429, 435 (5th Cir. 1995) (holding that PIP and termination of employment were adverse employment actions); see also *Pollak v. Lew*, No. H-11-2550, 2013 WL 1194848, at *9 (S.D. Tex. Mar. 22, 2013), aff'd, 542 Fed. Appx. 304 (5th Cir. 2013) (finding placement on a PIP could dissuade a reasonable employee from engaging in protected activity). But, "written warnings and unfavorable performance reviews are not adverse employment actions where colorable grounds exist for disciplinary action or where the employee continues to engage in protected activity." *Jackson v. Honeywell Int'l, Inc.* 601 Fed. Appx. 280, 286 (5th Cir. 2015) (citing *Burlington,* 548 U.S. at 68).

*Kraft v. Univ. of Tex. Med. Branch*, No. 3:16-CV-15, 2018 WL 1210721, at *6 (S.D. Tex. Mar. 8, 2018) (Hanks, J.). *See also Robin v. City of Frisco, Tex.*, No. 4:16-CV-00576, 2017 WL 5483883, at *9 (E.D. Tex. Nov. 15, 2017) (holding that issuing a negative performance evaluation and a PIP after plaintiff brought a discrimination complaint could support a retaliation claim); *Al-habash v. Raytheon Co.*, No. 4:15-CV-450, 2016 WL 6155601, at *9 (E.D. Tex. Oct. 24, 2016) (holding that a plaintiff's "PIP could satisfy the second element of his *prima facie* case for retaliation" and a "PIP can support retaliation as a matter of law...."). This Court agrees with Judge Hanks and, as such, concludes that Armstrong's placement on a PIP can be considered an adverse employment action for summary judgment purposes.

**Causation:** Armstrong must show a causal nexus between the protected activity and the adverse action. If this Court considers Armstrong's termination as the only

adverse employment action, then it follows that Armstrong cannot establish a prima facie case of retaliation because he cannot show a causal nexus between the protected activity (the December 2013 accommodation request or the July 2014 filing of an EEOC complaint) and the adverse employment action (May 2, 2016 termination). *See, e.g.,* *Ameen v. Merck & Co., Inc.*, 226 F. A'ppx 363, 376 (5th Cir. 2007) ("The timing of Ameen's termination, eleven months after she allegedly complained to Petrovich, casts significant doubt on the claim that her termination was in retaliation for that complaint."); *Grizzle v. Travelers Health Network, Inc.*, 14 F.3d 261, 268 (5th Cir. 1994) (10-month lapse in time suggested that retaliatory motive was unlikely). To this Court's knowledge, there are no reported cases holding that a plaintiff has satisfied a prima facie case of causation where, like here, there is a two-and-a-half-year time period between the protected activity and the adverse employment action (assuming termination is the adverse employment action).

However, because the Court has determined that a PIP can be considered an adverse employment action, Armstrong can also establish a prima facie case by demonstrating a causal link between his request for accommodation and his placement on a PIP. The request for accommodation took place in December 2013. Marathon placed Armstrong on a PIP on March 26, 2014. "Temporal proximity between an employer's knowledge of protected activity and an adverse employment action can serve, in some instances, as indirect evidence of a causal link." *Al-habash*, 2016 WL 6155601, at *9 (citing *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007)). However, the proximity between the employer's knowledge and the adverse employment

action must be very close. *Clark Cnty. Sch. Dist.*, 532 U.S. at 273. Here, the three to four month time period between the protected activity and the adverse employment action is simply too distant to establish the causal connection. *Id.* at 273–74 (citing cases holding that three and four months between employer's knowledge of protected activity and adverse employment action are too long to establish a causal link on its own). *See also Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 472 (5th Cir. 2002) (finding a five month lapse is not close enough without additional retaliation evidence).

In addition to examining the temporal relationship between the protected action and the discharge, the Fifth Circuit has held that it is helpful to look at several other factors for guidance in determining causation: (1) the extent of the employee's disciplinary record; and (2) whether the employer followed its policies and procedures in dismissing the employee. *Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 508 (5th Cir. 1994). Neither of these factors support causation in the present case.

Simply stated, Armstrong's long-standing performance issues and Marathon's adherence to its policies and procedures further militate against a finding that there is a causal link between Armstrong's accommodation request and his termination. As far as Armstrong's disciplinary record is concerned, his performance deficiencies and attendance issues long predated his December 2013 request for work-schedule limitations involving the turnaround. Moreover, as Marathon points out, Armstrong's employment record portrays consistent difficulty with achieving attendance, communication, and deadline requirements and goals. Additionally, the summary judgment evidence conclusively shows that Marathon followed its regular policies and procedures in both

evaluating Armstrong's 2013 performance and placing him on a PIP in March 2014 to address the documented deficiencies.   Armstrong's subjective belief that Marathon retaliated against him for requesting a different work schedule is simply insufficient to overcome summary judgment. *See Tejada v. Travis Ass'n for the Blind*, No. 1:12-CV-997-DAE, 2014 WL 4165370, at *6 (W.D. Tex. Aug. 7, 2014) ("at the summary judgment stage, subjective belief is insufficient to create a genuine factual issue for trial") (internal quotation marks, alteration, and citation omitted).   Because Armstrong has presented no probative evidence of a causal connection between his protected activity and his discharge, he has failed to establish the required prima facie case for an ADA retaliation claim.

### (b)    Legitimate Non-Retaliatory Reason

Although Armstrong has not established a prima facie case of retaliation, this Court will, nonetheless, address the two remaining steps of an ADA retaliation claim because doing so reaffirms this Court's view that summary judgment is appropriate.

With regards to the second step of the burden-shifting model utilized in ADA retaliation cases, once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to state a legitimate, non-retaliatory reason for the employment action. *Royal v. CCC & R Tres Arboles, LLC*, 736 F.3d 396, 400 (5th Cir. 2013).   In this case, Marathon easily meets its burden, proffering a legitimate, non-retaliatory reason for Armstrong's termination:   poor performance, lack of communication, and absenteeism. *See Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 320 (5th Cir. 1997) (poor job performance is a legitimate, non-discriminatory reason for termination).

### (c)     Pretext

Because Marathon has set forth a legitimate, non-retaliatory reason for Armstrong's termination, the burden shifts back to Armstrong to demonstrate that Marathon's proffered reason is actually a pretext for retaliation.  Cutting to the chase, Armstrong has failed to demonstrate that Marathon's decision to terminate him was a pretext for retaliation.

The summary judgment evidence clearly establishes that pervasive issues with performance, absenteeism, and lack of communication plagued Armstrong during the course of his employment with Marathon.  Indeed, from the time he started his employment with Marathon, Armstrong faced attendance-related issues.  He was removed from the Frontier Project in Ohio just four months into a two-year project for absenteeism and a severe lack of communication.  Upon returning to the Galveston Bay Refinery, he continued to encounter problems with excessive absences and a failure to properly communicate his whereabouts.  Armstrong's supervisors sat down with him to discuss his job performance and advised him that between vacation time, sick time, and personal issues, his absences amounted to 40 percent of his work schedule.  Not surprisingly, Armstrong's 2013 performance evaluation reflected Marathon's view that he failed to meet the company's expectations.  Marathon placed Armstrong on a PIP and counseled him on how to improve his overall performance.  Even so, Marathon contends that Armstrong failed to meet expectations under the PIP and, as a result, Marathon terminated his employment.

Armstrong contends that Marathon's purported reasons for his termination—poor performance and absenteeism—are pretextual, but he fails to provide any explanation as to why that is the case. For example, although Armstrong contends that his supervisor, Fred Kindervater, did little to address Armstrong's disability and failed to provide notice to others of Armstrong's disability, such an allegation is completely irrelevant to the key issue at the pretext stage: whether the reasons Marathon provided for Armstrong's termination (poor performance and absenteeism) were pretextual and not the basis for its decision to terminate him. Armstrong also complains that Marathon did not give him an opportunity to complete the PIP, but that argument is easily dismissed. The PIP ran for 90 days and was to end on June 25, 2014. Armstrong took short term disability on June 24, 2014, the day before the PIP was supposed to end, and he returned to work on May 2, 2016. Thus, May 2, 2016 became the last day of the PIP and Marathon terminated him on that day for failing to meet the PIP's job expectations.

Armstrong further argues:

This problem became compounded by a conflated performance review, where the employer failed to documents [sic] (time and dates) of the alleged deficiencies, and a subsequent performance improvement plan....

After [Armstrong's] request for accommodation and filing with the EEOC he was under the proverbial microscope for each and every move. [Armstrong] was barely in the door when he was sent on a temporary assignment. Within a short time of his hire, preparation of the 2013 began (according to the Company's document), asserting facts Armstrong took exception with (reports), consult unbecoming of an employee (verbal abuse, which is not documented) and an assertion of absenteeism, while ignoring [Armstrong's] plea for accommodation. Without rehashing that already mentioned, these facts are more than merely coincidental.

(Dkt. 42 at 53–54).  This does not create a fact issue.  Armstrong must do more than simply argue that Marathon made an incorrect decision.  *See LeMaire*, 480 F.3d at 391 ("Simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext.") (citation omitted).  "The ultimate issue on summary judgment is whether [Armstrong] produced evidence which could support a finding that [he] would not have been fired in the absence of [him] having engaged in protected conduct." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999) (citation omitted).  Here, the reasons that Marathon provides for Armstrong's termination are consistent with the reasons Armstrong was placed on the PIP—his performance failed to meet expectations and he was chronically late or absent.  Armstrong has not identified or submitted any summary judgment evidence showing that he successfully completed the PIP or that Marathon relied on something other than the PIP evaluation in reaching the decision to terminate him.  No genuine issue of material fact exists as to pretext given the extensive and unrebutted evidence that Armstrong was terminated due to his performance issues.  While Armstrong no doubt believes that he was retaliated against, there is simply not a scintilla of competent summary judgment evidence that he has pointed to that shows Marathon's proffered reason is a pretext.  Because Armstrong has failed to raise a triable issue of fact that retaliation was the "but-for" cause of his discharge, this Court recommends that summary judgment be entered in favor of Marathon on Armstrong's retaliation claims.

## V. CONCLUSION AND RECOMMENDATION

For the reasons stated above, the Court RECOMMENDS that Marathon's Motion for Summary Judgment (Dkt. 25) be GRANTED and Marathon's Objections to Plaintiff's Evidence Opposing Summary Judgment (Dkt. 43) be DENIED.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

SIGNED at Galveston, Texas, this 1st day of May, 2018.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE